```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE
```

George Tsiatsios

    v.                              Civil No. 07-CV-003-JL
                                        Opinion No. 2008 DNH 009
Anheuser-Busch, Inc.


**O R D E R**

The plaintiff, George Tsiatsios, sued Anheuser-Busch, Inc. in New Hampshire Superior Court alleging intentional interference with contractual relations.  Tsiatsios claimed that one of Anheuser-Busch's managers intentionally and improperly interfered with his employment at Gauthier Farm Enterprises, Inc. (Gauthier Farm).  Anheuser-Busch removed the case to this court, see 28 U.S.C. § 1441, and moved for summary judgment.  See Fed. R. Civ. P. 56.  The court has jurisdiction under 28 U.S.C. § 1332 (diversity).  After oral argument, and for the reasons set forth below, the court grants Anheuser-Busch's motion.


**I.   APPLICABLE LEGAL STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Dávila v. Corporación De P.R. Para la

Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  "The object of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Id. (internal quotation omitted).  A trialworthy issue of fact, however, "does not spring into being simply because a litigant claims that one exists." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  "[T]he nonmoving party must produce hard evidence of a material factual dispute to survive a summary judgment motion." U.S. v. 6 Fox Street, 480 F.3d 38, 42 (1st Cir. 2007) (internal citation omitted).

In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are set forth in accordance with that standard.

**II.  BACKGROUND**

Anheuser-Busch, the defendant, brews beer at its Merrimack, New Hampshire plant.  Beer fermentation, the process which gives beer its alcohol content and carbonation, creates a grain by-product commonly known in the industry as "spent grain."  To dispose of that grain, Anheuser-Busch contracted with Blue Sky Ag

Marketing (Blue Sky)[1] to purchase and oversee spent grain removal from the Merrimack brewery.  Over the years, Blue Sky has subcontracted with various trucking companies to haul the spent grain from the brewery to its customers at local farms.

Starting in 2000, George Tsiatsios worked for Elgin Cartage, Ltd., as a tractor-trailer truck driver, then for Milford Transportation, Inc., and then Gauthier Farm Enterprises, Inc. as each company assumed the hauling contract with Blue Sky.  With each trucking company, Tsiatsios' job responsibilities included driving onto Anheuser-Busch's property, monitoring the grain levels in the brewery's storage tanks, loading the spent grain onto his truck, and hauling the grain to Blue Sky's customers. As Tsiatsios was repeatedly made aware, Anheuser-Busch promulgated safety and security rules requiring truck drivers such as himself to wear identification badges, hard hats, safety glasses, and earplugs while on brewery property.  By his own concession, Tsiatsios understood that a failure to comply with these rules would result in his being banned from the brewery. For example, Tsiatsios acknowledges that in early 2004, soon after another grain driver suffered an eye injury at the brewery,

---

[1] Blue Sky is a grain by-products broker.  It sold the spent grain to farmers throughout New England as cattle feed.

Tsiatsios received a memo from his employer at the time, Milford Transportation, advising:

> Any driver that is observed not wearing safety equipment and their ID badge at the brewery will be banned from entering the brewery.
>
> If you are banned from the brewery, you will not have a job. We cannot load for you.
>
> This is a very serious matter and could result in loss of the contract by Milford Transportation or Blue Sky Ag North. No exceptions will be considered.

In the four months preceding Tsiatsios' termination alone, Blue Sky and Milford Transportation reminded him of Anheuser-Busch's safety and security rules, and stressed the importance of adhering to them, on at least five separate occasions.

Tsiatsios began driving for Gauthier Farm on July 1, 2004, but was terminated four days later following an altercation with Roland Vance, Anheuser-Busch's resident health and safety manager. That morning, Tsiatsios drove his truck to the Anheuser-Busch brewery to pick up spent grain, just as he had on numerous prior occasions for Gauthier Farm and its predecessor haulers, and waited in a nearby control room for his truck to fill with grain. Soon thereafter, Vance entered this room and found Tsiatsios, who he did not know, without an identification

badge[2] and wearing aviator sunglasses that did not comply with the brewery's policy on protective eyewear.[3]  Vance introduced himself and explained that he worked for Anheuser-Busch.  While the two men had not previously met, Tsiatsios was aware that a man named "Roland Vance" worked for Anheuser-Busch and had "something to do with safety."

Vance then asked Tsiatsios who he was, why he was on Anheuser-Busch property, and how he had gotten into the grain loading area.  Tsiatsios repeatedly refused to identify himself to Vance, and would only reveal that he was at the brewery to load grain.  Following a brief discussion regarding the appropriateness of the sunglasses he was wearing, Tsiatsios walked out of the room while Vance was still asking him

---

[2] Prior to his encounter with Vance, Tsiatsios claims to have spoken with a security guard at the brewery about obtaining an identification badge, but had been told that security personnel were out of "blanks."

[3] Tsiatsios acknowledges having read the specific portion of one memo advising him "that prescription eye glasses or sunglasses are not a substitute for safety glasses."  Milford Transportation had previously issued Tsiatsios the required safety glasses, but he was not wearing them at the brewery that day.

questions, ignoring or disregarding Vance's requests that he stop.[4]

Don Paulson, Blue Sky's director of operations, was at the brewery overseeing the transition from Milford Transportation to Gauthier Farm when he observed Tsiatsios exit the control room followed by Vance.  While none of these men were familiar with one another prior to this incident, Paulson did believe that Tsiatsios was one of Gauthier Farm's grain drivers.  Paulson approached Tsiatsios and briefly spoke with him about what had just happened before advising him to put on a proper pair of safety glasses.  As Blue Sky's representative at the brewery, Paulson then introduced himself to Vance and asked for his version of the events.  Vance relayed that when he came upon Tsiatsios in the control room he lacked proper safety equipment and, when confronted, refused to identify himself or adequately explain his presence before walking away.  Vance then impressed upon Paulson the importance that Anheuser-Busch placed on drivers' adherence to its safety policies and indicated that

---

[4] While claiming to have left the control room to check on the amount of grain in his trailer, Tsiatsios has been unable to provide any explanation for why he continually refused to identify himself.  When directly and repeatedly questioned on this point at his deposition, Tsiatsios repeatedly testified only that "I was there to load grain," and that he did not identify himself "[b]ecause I didn't."

Tsiatsios' behavior--failing to identify himself to an Anheuser-Busch employee and rudely responding when asked to do so--was unacceptable.  Paulson informed Vance that he would contact Tsiatsios' employer about the incident and rectify the situation.

Paulson relayed Vance's account and his own observations to Chris Gauthier, the vice president in charge of trucking at Gauthier Farm.  Paulson informed Gauthier that he did not want Tsiatsios, whom Gauthier had confirmed was the employee in question, back on Anheuser-Busch property.  Later, after confirming Paulson's version of the events with Vance, Gauthier terminated Tsiatsios' at-will employment with Gauthier Farm.[5] There is no evidence before the court that Vance ever excluded Tsiatsios from the brewery himself or instructed anyone at Blue Sky or Gauthier Farm to do so.

### III. **ANALYSIS**

Under New Hampshire law, a plaintiff alleging intentional interference with contractual relations must show that "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant

---

[5] At oral argument, Tsiatsios conceded that there was nothing improper about Gauthier Farm's termination of his employment.

7

intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Singer Asset Fin. Co., LLC v. Wyner, 156 N.H. 468, 478 (2007). Anheuser-Busch argues that Tsiatsios has not only failed to present any evidence that it intentionally or improperly interfered with his employment at Gauthier Farm, but that, as a matter of law, it "cannot be held liable in tort where it was acting to protect its legitimate interests, requiring that [Tsiatsios, a business invitee] comply with its known safety and security rules." Tsiatsios responds that summary judgment should be denied because the record "could support a jury finding that Vance acted intentionally and improperly toward plaintiff." Specifically, he argues that Vance's characterization of Tsiatsios' behavior as unacceptable contained an implicit directive to Blue Sky to ban Tsiatsios from the brewery.

### A.   Intentional interference

To establish that the defendant's interference was intentional and improper, a "plaintiff ha[s] to 'show that the interference with his contractual relations was either desired by the defendant or known by [it] to be a substantially certain result of [its] conduct.'" Demetracopoulos v. Wilson, 138 N.H. 371, 374 (1994) (quoting Restatement (Second) of Torts § 767 cmt.

d). Here, the only interference alleged by Tsiatsios consists of Vance's statements to Paulson regarding what transpired in the control room. The record shows only that Vance, when questioned by Paulson, relayed his version of the events, stressed the importance of following the brewery's safety procedures in the future, and indicated that Tsiatsios' actions and behavior were unacceptable. Assuming, <u>arguendo</u>, that affirmatively banning Tsiatsios from the plant would have constituted intentional interference, the record is bereft of any evidence that anyone from Anheuser-Busch actually excluded Tsiatsios from its brewery. Nor is there any evidence that an Anheuser-Busch representative asked anyone at Blue Sky or Gauthier Farm to do the same. Indeed, it is Paulson, Blue Sky's man on site, who swears in his affidavit--the lone piece of evidence before the court that addresses this aspect of Tsiatsios' claim--that "I told Mr. Gauthier . . . that <u>I did not want Tsiatsios back on Anheuser-Busch property</u>." Paulson unilaterally made the decision to exclude Tsiatsios from the brewery, and there is nothing in the record to suggest the contrary.[6] See <u>Singer</u>, 156 N.H. at 478

---

[6] Tsiatsios' argument is further attenuated by the fact that Vance's statements were not made to anyone at Gauthier Farm, but to a representative from Blue Sky.

9

(noting that element of claim is that interference must be intentional).

Tsiatsios argues that Vance's statements to Paulson were a "thinly veiled code for 'get rid of that man,'" and, therefore, improper.  He asks the court to infer that since the brewery's rules were (according to Tsiatsios) only loosely enforced on drivers, and, because he "followed the well-known and long-standing practice of drivers to not wear the ID tags and safety equipment," Vance's statements must have been intended to effect his termination.  The underlying premise of this argument, however--that since Anheuser-Busch made little effort to enforce its rules, a termination based upon a purported violation of these rules must have been improper--has no support in the record.  Rather, the summary judgment record establishes that Anheuser-Busch made a consistent and concerted effort to ensure the grain drivers' compliance with its policies.  Tsiatsios acknowledges that he and other drivers received numerous notices in the months preceding his termination reminding them that it was necessary to follow the brewery's safety policies, clarifying any confusion as to what safety equipment was deemed appropriate, and warning that any failure to comply would result in termination.  (Defs.' Mot. for Summ. J. Ex. D-I; Pl.'s Dep. 157, 161, 166-67, 170, 171-72, 173-74, 179.)

Further, even if the court accepted that Anheuser-Busch had ordered Tsiatsios' exclusion from the brewery, there is no evidence before the court that Anheuser-Busch desired, or was substantially certain, that doing so would result in his termination from Gauthier Farm.  Tsiatsios argues that Anheuser-Busch must have been aware of this as "[i]t was common knowledge that trucking companies like Milford and Gauthier existed to service the [] brewery and that the drivers for Milford and then Gauthier, like plaintiff, worked exclusively hauling grain."  But his only evidence in support of that assertion is the affidavit of his brother, fellow spent grain hauler Charles Tsiatsios, stating:  "It is common knowledge among the drivers, among the security staff at the brewery that we deal with every day, and among the companies that contract with the brewery that if a driver is banned from the brewery that person has just lost his job."  (Charles Tsiatsios Aff. ¶ 10.)  Even crediting this affidavit, as generally required on a motion for summary judgment, see Mulvihill, 335 F.3d at 19; but see Schubert v. Nissan Motor Corp. in U.S.A., 148 F.3d 25, 30 (1st Cir. 1998) (noting that only affidavits based on personal knowledge should be considered by a court ruling on summary judgment); Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 602, Tsiatsios' brothers speaks

only of grain drivers, security personnel,[7] and trucking companies working at the brewery. He fails to ascribe this "common knowledge" to the only party whose knowledge is relevant to the inquiry; Anheuser-Busch. Thus, the Charles Tsiatsios' affidavit is not probative of whether the defendant's conduct was intentional.

As Tsiatsios has failed to present evidence that Anheuser-Busch's alleged interference with his employment was intentional as that term is understood under the applicable law, Anheuser-Busch is entitled to judgment as a matter of law.

**B. Improper interference**

As an alternative basis for granting summary judgment, the court notes that even intentional interference, "in itself, is legally insufficient to state a claim. Rather, only improper interference is deemed tortious in New Hampshire." Kilty v. Worth Dev. Corp., No. 05-2101 2006 WL 1606174, at *2 (1st Cir. June 13, 2006) (internal citation omitted) (emphasis in original). Under New Hampshire law, interfering with the contractual relations of another is not improper--and, thus, not

---

[7] It was established at oral argument that security personnel at the Merrimack plant are employed by an outside contractor, and are not Anheuser-Busch's employees.

tortious--where the defendant merely relayed truthful information to a third party, or interfered as a means to protect its own legitimate interests.

Citing the Restatement (Second) of Torts § 772, New Hampshire courts have long recognized the permissibility of interference with a contract by conveying "truthful information" or "honest advice" to a third person. See, e.g., Feeney v. Kressy, No. 05-CV-461-JD, 2006 WL 1081128, at *4 (D.N.H. Apr. 20, 2006) ("New Hampshire . . . recognizes a privilege for a person to interfere with a contract by giving honest advice to a third person"; Riblet Tramway Co., v. Ericksen Assoc., Inc., 665 F. Supp. 81, 87 (D.N.H. 1987) (applying New Hampshire law); Montrone v. Maxfield, 122 N.H. 724, 726 (1982) ("any truthful information or honest advice given by the defendant cannot constitute wrongful interference"). As the Restatement explains, there is nothing improper about intentionally causing a third party to break off a contractual relationship by giving truthful information:

> There is of course no liability for interference
> with a contract . . . on the part of one who
> merely gives truthful information to another. The
> interference in this instance is clearly not
> improper. This is true even though the facts are
> marshaled in such a way that they speak for
> themselves and the person to whom the information
> is given immediately recognizes them as a reason

>     for breaking his contract or refusing to deal with
>     another.

Restatement (Second) of Torts § 772 cmt. b (1979).  Here, the uncontroverted evidence is that Paulson asked Vance what had happened in the control room.  In response, Vance merely provided what he believed--and what Tsiatsios concedes--was truthful information.  Apart from the characterization of his behavior as unacceptable, Tsiatsios does not dispute the conclusion that the substance of Vance's statements was truthful; his argument, instead, is that Vance improperly intended for his comments to result in Tsiatsios' termination from Gauthier Farm.  As explained supra Part III(A), however, this argument has no evidentiary support.

But even assuming, arguendo, that Anheuser-Busch intended to cause Tsiatsios' termination, New Hampshire law provides that certain conduct, which would otherwise amount to tortious interference with contractual relations, is justified where an employer has acted to protect its own legitimate interests.  See, e.g., Emery v. Merrimack Valley Wood Prods., Inc., 701 F.2d 985, 989 (1st Cir. 1983) (enforcing former employee's covenant not to compete); Donovan v. Digital Equip. Corp., 883 F. Supp. 775, 788 (D.N.H. 1994) (same); Nat'l Employment Serv. Corp. v. Olsten Staffing Serv., 145 N.H. 158, 160 (2000) (enforcing restrictive

14

covenant); Roberts v. General Motors Corp., 138 N.H. 532, 541 (1994) (recognizing franchisor's legitimate interest in selecting its franchisees); Technical Aid Corp. v. Allen, 134 N.H. 1, 10 (1991). The Restatement, which is cited as authority in a number of the above cases, explains that:

> One who, by asserting in good faith a legally protected interest of his own . . . intentionally causes a third person not to perform an existing contract . . . does not interfere improperly with the other's relation if the actor believes that his interest may otherwise by impaired or destroyed by the performance of the contract or transaction.

Restatement (Second) of Torts § 773. Here, Vance's statements to Paulson manifested nothing more than Anheuser-Busch's interest in enforcing its safety and security policies. This interest involves numerous legitimate concerns including public safety, workplace safety, its own economic interests, and, as often is the case, insulation from civil liability.

Tsiatsios has failed to establish a genuine issue of material fact warranting trial. The undisputed facts of this case establish that Anheuser-Busch neither intentionally nor improperly interfered with the employment relationship between Tsiatsios and Gauthier Farm, both of which he must prove to support his claim. See Singer, 156 N.H. at 478. Anheuser-Busch,

therefore, is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).

## IV. CONCLUSION

For the foregoing reasons, the court grants Anheuser-Busch's motion for summary judgment (document no. 29) on Tsiatsios' claim for intentional interference with contractual relations.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:   January 16, 2009

cc:  Michael J. Sheehan, Esq.
     Arthur G. Telegen, Esq.
     Lawrence S. Smith, Esq.